UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

*(Filed Electronically)*

| | |
|---|---|
| MARLO D. BROWN | ) |
| | ) |
| -and- | ) |
| | ) |
| TA'NITA M. HIPSHER, | ) |
|     as guardian for the minor children | ) |
| | ) |
|     *PLAINTIFFS* | ) |
| | ) |
| V. | ) |
| | ) |
| LOUISVILLE-JEFFERSON COUNTY | )     **COMPLAINT** |
| METRO GOVERNMENT | ) |
|     527 W. Jefferson Street, 4th Floor | ) |
|     Louisville, KY 40202 | ) CASE NO.: 3:19-cv-906-DJH |
| | ) |
| -and- | ) |
| | ) |
| STEVE CONRAD | ) |
|     Louisville Metro Police Department | ) |
|     633 W. Jefferson Street | ) |
|     Louisville, Kentucky 40202 | ) |
| | ) |
| -and- | ) |
| | ) |
| STEPHEN ROEDERER, Individually and | ) |
| in his Official Capacity | ) |
|     Louisville Metro Police Department | ) |
|     633 W. Jefferson Street | ) |
|     Louisville, KY 40202 | ) |
| | ) |
| -and- | ) |
| | ) |
| JESSICA DICKEY, Individually and | ) |
| in her Official Capacity | ) |
|     Louisville Metro Police Department | ) |
|     633 W. Jefferson Street | ) |
|     Louisville, KY 40202 | ) |
| | ) |
|     *DEFENDANTS* | |

Come the Plaintiffs, MARLO D. BROWN (hereinafter "MR. BROWN") and TA'NITA M. HIPSHER (hereinafter "MS. HIPSHER"), as guardian for the minor children, D.H. and M.H. (hereinafter "the minor children"), by and through their undersigned counsel, and hereby bring this Complaint before this Honorable Court, in which they seek damages for the violations of their federal rights by the named Defendants, as well as damages for their state law causes of action. In support of this action thereof, the Plaintiffs now hereby allege the following:

## JURISDICTION AND VENUE

1.      This is an action for damages in excess of Fifteen thousand dollars ($15,000.00), exclusive of attorneys' fees, costs, and interest.

2.      Plaintiff's claims arise pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments of the United States Constitution, as well as under the statutory and common laws of the Commonwealth of Kentucky.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343 over the § 1983 claims pursued herein.

3.      This Court thereby has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims in this Complaint as they are so related to the claim or claims that form the basis of the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

4.      That venue is proper in this Court, being the Western District of Kentucky, pursuant to 28 U.S.C. § 1391.

5.      All conditions precedent to the maintenance of this action have been performed or have occurred prior to the filing of this action.

## PARTIES

6.     MR. BROWN is, and at all times relevant hereto has been, a lawful and physical resident of Louisville, Jefferson County, Kentucky in the United States of America.

7.     MS. HIPSHER is, and at all times relevant hereto has been, a lawful and physical resident of Louisville, Jefferson County, Kentucky in the United States of America.

8.     The minor children are, and at all times relevant hereto have been, lawful and physical residents of Louisville, Jefferson County, Kentucky in the United States of America.

9.     At all times material hereto Defendant, LOUISVILLE - JEFFERSON COUNTY METRO GOVERNMENT (hereinafter "Defendant METRO"), is and has been, a political subdivision of the Commonwealth of Kentucky, organized and existing under the laws of the Commonwealth of Kentucky with a principle place of business located at 527 W. Jefferson Street, 4th Floor, Louisville, KY 40202.

10.     At all times material hereto Defendant METRO, pursuant to Kentucky Revised Statute (KRS) 67C.101 has and does operate and control the Louisville Metro Police Department (hereinafter "LMPD"), its police officers, employees, agents, and representatives, including, but not limited to, Defendants STEPHEN ROEDERER (hereinafter "Defendant ROEDERER").  And JESSICA DICKEY (hereinafter "Defendant DICKEY") Pursuant to KRS 67C.101, Defendant METRO is ultimately responsible for the training and supervision of the named individuals and responsible for the police policies described elsewhere in this Complaint.

11.     Defendant STEVEN CONRAD (hereinafter "Defendant CONRAF) is, at the time of this filing, the LMPD Chief. At all times relevant herein, he acted under the color of state law. He is sued in his individual and official capacities

12.     At all times material hereto LMPD and its agencies, employees and agents were acting within the course and scope of their powers and/or employment.  At all times material hereto, the agents of LMPD were responsible for the establishment of policies, either formally or by custom, regarding employment, training, retention. Supervision and conduct of Defendants ROEDERER and DICKEY, and, additionally, were responsible for the employment, training, retention, supervision and conduct of Defendants ROEDERER and DICKEY. Thus, the agencies, employees and agents of LMPD, and in turn Defendant METRO, were in their official capacity and vicariously viable for the tortious acts and omissions of Defendants ROEDERER and DICKEY pursuant to KRS 70.040 and Jones v. Cross, 260 S.W. 3d. 343 (Ky 2008).

13.     At all times material hereto, Defendant ROEDERER is, and has been, a natural person, sworn by the Commonwealth of Kentucky with the ability to work as a police officer, and is, and has been, employed by LMPD as a sworn police officer. Upon information and belief, Defendant ROEDERER engaged in and completed LMPD's police training academy and has been employed as a police officer with LMPD since that time.

14.     At all times material hereto, Defendant ROEDERER was acting within the course and scope of his employment as an LMPD officer.  Defendant ROEDERER is being sued in his individual capacity, as well as in his official capacity for his actions as an officer for LMPD.

15.     At all times material hereto, Defendant DICKEY is, and has been, a natural person, sworn by the Commonwealth of Kentucky with the ability to work as a police officer, and is, and has been, employed by LMPD as a sworn police officer. Upon information and belief, Defendant DICKEY engaged in and completed LMPD's police training academy and has been employed as a police officer with LMPD since that time.

16.     At all times material hereto, Defendant DICKEY was acting within the course and scope of her employment as an LMPD officer. Defendant DICKEY is being sued in her individual capacity, as well as in her official capacity for her actions as an officer for LMPD.

**GENERAL FACTS**
**(APPLICABLE TO ALL COUNTS)**

17.     MR. BROWN is a 50-year-old disabled father, whose came into this situation when he was pulled over by Defendants ROEDERER and DICKEY, who, while on patrol decided that MR. BROWN, for one reason or another, had to be engaging in illegal activity with his young children in the car, and that they must stop and search his vehicle.

18.     MR. BROWN's interaction with Defendants ROEDERER and DICKEY occurred on December 19, 2018, when Defendants ROEDERER and DICKEY pulled MR. BROWN over for an alleged failure to signal a lane change, which Defendant ROEDERER proceed to claim was "not a big deal".

19.     MR. BROWN's two small children, D.B. and M. B. were also in the vehicle at the time of the stop.

20.     Defendant ROEDERER then asked MR. BROWN for his identification and whether he was the owner of the car, and if it was insured. MR. BROWN cooperated and proceeded to produce all necessary documents. Defendant ROEDERER then asked if MR. BROWN's address was current.

21.     Upon returning to their patrol car Defendant ROEDERER's first words were "Dammit Marlo!" He then proceeded to state Mr. Brown's address and his belief that it was "too far." As Defendants ROEDERER and DICKEY continued to discuss MR. BROWN's residence and its proximity to their stop, Defendant ROEDERER then stated, "this guy's probably fucking driving around buying dope" followed by "he better not be loaded".

22.     As they are presumably running MR. BROWN's name for active warrants Defendant DICKEY can be heard laughing and stating, "this is going to be a really good stop."

23.     The body camera then goes silent for a period of time. The next thing that can be heard is Defendant DICKEY laughing as she says, "and a kid in the back seat is like hi" and "was trying to do homework."

24.     The Officers then get back out of their vehicle and return to either side of MR. BROWN's vehicle and Defendant ROEDERER asks "Mr. Brown can you come back here and talk?" Defendant ROEDERER proceeds to pat MR. BROWN down and asks him if he "has anything on him". After the pat down reveals no contraband Defendant ROEDERER asks MR. BROWN to step to the back of his vehicle.

25.     Defendant ROEDERER then leads the next part of the conversation at the back of the car with "Alright man, is there anything in the car you're not supposed to have?" Defendant DICKEY can be seen standing behind MR. BROWN within listening distance during this part of the interaction. MR. BROWN responds with a "No." The following colloquy then ensures:

> ROEDERER: No?
>
> BROWN: No!
>
> ROEDERER: Okay. I know you haven't been in trouble in a while. So there ain't nothing in there you not supposed to have?
>
> BROWN: No, why? Ya'll wanna search the car?
>
> ROEDERER: Okay. Is there anything in there?
>
> BROWN: Ain't nothing in the car.

ROEDERER: Okay, you care if I take a look real quick, send you on your way? I ain't gotta give you a ticket or nothing. Otherwise I'm going to get canine over here and have them search.

BROWN: For what?

ROEDERER: Just in case, I got a job to do man. So, is there anything in your car that I need to know about? I'll be honest with you man, I'll be honest with you, ok? We're out here on a narcotics detail man looking for big stuff. If you got a little bit I ain't worried about it okay? Chances are I'll send you on your way.

BROWN: I ain't got nothing, but why did ya'll stop me?

ROEDERER: I told you why I stopped you.

BROWN: okay well why…okay well why ya'll need to go in my car?

ROEDERER: Based on your history

BROWN: Based on my history?

ROEDERER: Mmhmm

BROWN: Based on my history? I'd rather not now because I haven't done anything. I haven't done anything.

ROEDERER: Okay, alright, well I'm going to see if there is a canine over here. They'll do a wrap around your car and if you have any dope in your car they're going to get in it.

BROWN: Okay they can get in it.

ROEDERER: Okay, alright

BROWN (to caller on phone): Yup, they want to search me. What did you say?

ROEDERER: I ain't trying to give you a hard time man, I just want to get you out of here. If you don't have anything man, can I just look real quick and get out of here? I'm not going to write you a ticket for the traffic stuff. I see you are already in court for two other traffic stuff.

BROWN: Yeah, come on man so we can get this over with. Yeah go ahead and look in there.

ROEDERER: Okay, just hang tight right here. Alright I'll…man I'm going to leave your kids in the car. Okay? I don't want them out?

BROWN: Okay they are spooked about the police…

ROEDERER: Okay I get ya, I'll talk to them.

BROWN: Because of past incidents that I done had…

ROEDERER: I ain't trying to give you a hard time dude, it is what it is, and I know, like I said, you haven't been charged with anything in a long time other than some traffic shit, which I ain't worried about.

BROWN: I'm just saying, two traffic tickets…

ROEDERER: Yeah, I ain't worried about it, I ain't trying to give you another one. So, like I said, we are out here on a detail…even if you got something little, I don't really care. Long as you ain't got pounders or nothing I ain't worried about it.

26.     Defendant ROEDERER then proceeds to search the driver's seat area of MR. BROWN's car. Through his wearable video system ("body camera") he can be heard talking to one of MR. BROWN's children, who was in the car. He asks if the child is "okay" and tells them that they have "nothing to worry about" and their father "isn't in trouble".

27.     Defendant ROEDERER then enters the door behind the driver's seat and searches the area near where MR. BROWN's young son is sitting.

28.     Upon reaching the front passenger seat, where MR. BROWN's daughter is sitting, Defendant ROEDERER proceeds to look into a plastic bag and ask the girl what is inside. She responds that it is her dad's diabetes medicine. Defendant ROEDERER then continues his search by looking under the seat of the vehicle, his head coming within inches of the young girl's lower body.

29.     During Defendant ROEDERER's search of the vehicle, Defendant DICKEY remained at the back of the car with MR. BROWN.

30.     After completing his search Defendant ROEDERER informed MR. BROWN that he had to "calm [his son] down a little bit."

31.     When asked again about why he was stopped Defendant ROEDERER reaffirmed that he he had pulled MR. BROWN over for only an alleged traffic infraction, but this was what they "did" to try to find drugs. He also informed MR. BROWN that he would not be writing him a traffic citation because he "wasn't that worried about it."

32.     As a result of the continuing unconstitutional and tortuous actions by the Defendants and/or their agents, MR. BROWN sustained serious and significant violations of his Constitutional rights.

33.     As a result of the unconstitutional and tortuous actions by the Defendants and/or their agents, MR. BROWN and his minor children sustained damages.

## COUNT I: VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION FOR
### (Against Defendants ROEDERER and DICKEY)

34.     The Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

35.     42 U.S.C. § 1983 provides that:

> "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress..."

36.     On December 19, 2018, Defendants ROEDERER and DICKEY, acting under color of the law of the Commonwealth of Kentucky, and in the course and scope of their duties with the LMPD, unlawfully detained MR. BROWN and searched his vehicle, which they did knowing they did not have probable cause.

37.     This arrest amounted to a constitutional deprivation of MR. BROWN's rights, privileges and immunities, as secured by 42 U.S.C. § 1983 and the Due Process clauses of the Fourth and Fourteenth Amendments to the United States Constitution. These rights include, but are not limited to:

        a.  The right to not be stopped by police officers when there is no reasonable suspicion or probable cause;

        b.  The right to not be frisked by officers when there is no reasonable suspicion that the person is armed;

        c.  The right to not be searched by officers when there is no reasonable suspicion or probable cause;

    d.   The right to not be detained by officers when there is no reasonable suspicion or probable cause;

    e.   The right, when subjected to a traffic stop, to not be subjected to an investigative detention without reasonable suspicion of criminal activity; and

    f.   If an investigation detention is justified, the right to a temporary detention which lasts no longer than is necessary to effectuate the purpose of the stop.

38.    Defendants ROEDERER and DICKEY, and all other reasonable police officers, know or should know of MR. BROWN's Constitutional rights at the time of the complained of conduct as they were clearly established at that time.

39.    In the course of their interactions, Defendants ROEDERER and DICKEY, acting under the color of law, and in the course and scope of their duties with the LMPD, deprived MR. BROWN of his Constitutional rights by detaining him under knowingly improper pretenses, even though they knew, or should have known, that such pretenses were unreasonable in light of the facts and circumstances.

40.    They also knew, or should have known, that such pretenses were in violation of MR. BROWN'S rights and that police officers shall not engage in conduct which constitutes a deliberate indifference to these rights.

41.    The only "conduct" MR. BROWN was alleged to have engaged in was a simple traffic violation. Therefore, he maintained his clearly established Constitutional right under the Fourth and Fourteenth Amendments to bodily integrity and to be free from unlawful detentions and searches by law enforcement.

42.    Per the Court in Terry v. Ohio, an officer must observe unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot and that

the persons with whom he is dealing may be armed and dangerous. If there is no reasonable suspicion, or if where nothing in the initial stages of the encounter serves to conjure a reasonable fear for his own or others' safety, the officer is not permitted conduct a search of the person. 392 U.S. 1, 30-31, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

43.     When conducting traffic stops, LMPD officers are bound by their Standard Operating Procedures (hereinafter "SOP") Manual. Included in those Procedures are the following requirements from Section 3.6 and 7.12.7 in regard to traffic stops:

a.  To only perform a Consent Search based on the consent of the individual whose person or property is being searched.

b.  To only accuse a suspect of a particular crime when Probable Cause for the same existed and were based upon reliable objective facts.

c.  To know that reasonable suspicion requires articulable facts that, within the totality of the circumstances, leads an officer to reasonably suspect that criminal activity has been, is being, or is about to be committed.

d.  To only perform pat downs or frisks of the outer garments of a suspect for weapons if the suspect has been legitimately stopped with reasonable suspicion of a crime and the officer has reasonable grounds to believe that the suspect is armed and dangerous to the officer or others.

e.  To only engage in Terry Stops when there is reasonable suspicion that the individual may have been engaged, is engaging, or is about to engage in criminal activity.

    f.   To not detain a suspect for longer than what is reasonably necessary to make reasonable inquiries and either confirm or refute his/her suspicions of criminal activity.

    g.   To consider the following prior to making a pat down:

        i.   The type of crime suspected;

        ii.   Prior knowledge of the suspect's use of force and/or propensity to carry deadly weapons;

        iii.   The demeanor of the suspect; and

        iv.   Visual indications that suggest that the suspect is carrying a firearm or other weapon.

    h.   To only conduct a warrantless search of a vehicle based upon probable cause or consent.

    i.   To observe and follow the Strategies and Tactics of Patrol Stops (S.T.O.P.S.) lesson plan.

    j.   To make a reasonable effort to provide an explanation as to why the citizen was stopped, unless doing so would undermine an investigation or jeopardize the officer's safety.

    k.   To never detain a suspect for longer than what is reasonably necessary to make reasonable inquiries and either confirm or refute the suspicions of criminal activity.

44.    Here the Defendants knew MR. BROWN was not engaging in any criminal activity, which is indicative that the Defendants acted in a manner that was objectively unreasonable, intentional, reckless, deliberate, callously indifferent, wanton and/or malicious, and was indicative

of a total and reckless disregard of and indifference toward the Constitutional rights of MR. BROWN.

45.     Defendants ROEDERER and DICKEY were consciously aware that their actions resulted in an unlawful and unreasonable detention and search of MR. BROWN and were not only in violation of MR. BROWN's clearly established constitutional rights, but that they were likely to cause harm or injury to MR. BROWN.

46.     Further, Defendants ROEDERER and DICKEY's actions were carried out in such a manner and with such a significant amount of unnecessary actions that they shock the conscience, and unreasonably restrained MR. BROWN of his freedom.

47.     The Defendants' individual and collective actions were deliberate deprivations of the Plaintiffs' rights guaranteed by the U.S. Constitution under the Fourth Amendment and Fourteenth Amendment, as well as those afforded under all other applicable state and federal laws, including but not limited to those within 42 U.S.C. § 1983.

48.     As the Defendants' conduct was in part due to the practices, policies and customs of LMPD/Louisville Metro Government, the Officers have been properly sued individually and in their official capacities under 42 U.S.C. § 1983 as the city itself is also responsible for subject constitutional violations.

49.     As a direct and proximate result of the constitutional violations described herein and committed by Defendants ROEDERER and DICKEY, MR. BROWN suffered financial loss, embarrassment, and phycological harm which has created damages in excess of the jurisdictional limits of this Court. Further, his minor children suffered embarrassment and psychological harm from.

50.     Defendants ROEDERER and DICKEY are therefore liable for their conduct which resulted in MR. BROWN's unlawful detention and search, as well as all damages sustained by the him and his minor children.

51.     The Plaintiffs accordingly seek damages including, but not limited to, compensatory and nominal damages, legal fees, destruction of earning capacity, mental pain and suffering, and punitive damages from Defendants ROEDERER and DICKEY.

**WHEREFORE**, the Plaintiffs, MARLO BROWN and TA'NITA HIPSHER, demand judgment against Defendants ROEDERER and DICKEY, for all damages, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and any other relief this Court deems just and proper.

## COUNT II: VIOLATIONS OF 42 U.S.C. § 1983 AND THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### (Against Defendants CONRAD and METRO)

52.     The Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

53.     In order to establish a municipal liability under 42 U.S.C. § 1983, a Plaintiff must show that the alleged constitutional violation occurred because of a municipal custom or policy. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  That requisite showing can be made by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013).

54.     Defendants CONRAD and METRO should be held liable for MR. BROWN's Constitutional violations under § 1983 based on the following theories of culpability: (1) that an official with final decision-making authority ratified illegal actions and (2) the existence of a custom of tolerance or acquiescence of federal rights violations.

55.     Defendant CONRAD is the Chief of Police for LMPD, which is an agent of Defendant METRO, meaning any actions or inactions by Defendant CONRAD and/or LMPD can also be attributed and/or extended to Defendant METRO.

56.     The LMPD SOPs, at all times relevant herein, required officers to refrain from Biased Law Enforcement Practices and confirm that supervisors are required to familiarize their personnel with the policy on biased policing, support its provisions, observe officer behavior to identify and prevent biased law enforcement practices, and immediately report any biased law enforcement practice, in writing, through the appropriate chain of command, to the Chief of Police.

57.     In 2017, LMPD implemented a "People, Places and Narcotics" initiative, custom and internal policy. While this initiative was not memorialized in the LMPD SOPs, LMPD Defendant CONRAD has confirmed its existence.

58.     This initiative, while inconsistent with official policy, was the practiced custom of multiple LMPD Divisions under directives from Defendant CONRAD. The Defendant LMPD Officers are the subordinates of Defendant CONRAD.

59.     Defendant CONRAD is/was ultimately responsible for these policies, practices and customs which, as further identified herein, created the existence of a custom of tolerance or acquiescence of federal rights violations, and led to constitutional violations of his subordinates.

60.     Defendant CONRAD explicitly and implicitly authorized, approved and/or knowingly acquiesced in the subject unconstitutional conduct of the LMPD Officers, thus acting as an official with final decision-making authority who ratified illegal actions.

61.     The "People, Places and Narcotics" included explicit and implicit directives to LMPD Officers to engage in the following actions in order to "fight violent crime":

    a.  To target specific neighborhoods. Notably, the majority of these neighborhoods have a high concentration of the city's black residents.

    b.  To use traffic stops as a tool for identifying violent crimes.

    c.  To identify certain characteristics, such as age, sex, race and vehicle types as a basis for following vehicles and initiating stops.

    d.  To conduct a traffic stop for any observed violation, or to at least cite a reason for the stop which would substantiate a stop.

    e.  To use deceptive practices, such as telling the drivers that they appear "nervous", as a pretext for getting the vehicle occupants to exit the vehicle.

    f.  To make traffic stops in a process which intimidate and trick the vehicle occupants in manners likely to obtain their consent for searches and detentions. These methods included conducting stops with several officers and unmarked vehicles, boxing in the suspect's vehicles, surrounding the vehicle with several officers, accusing the vehicle occupants of appearing to have something to hide, using quick double-negatives to trick occupants into consenting to searches ("you've got nothing to hide and don't care if I search the vehicle, right?" If the suspect says "yes" or "no", the officer will cite consent based upon the way the

question was asked) and suggesting that consenting to searches and detentions
will be the only way to satisfy the officers' demands without ending up in jail.

g.  To force vehicle occupants to exit the vehicle on every stop without regard for
probable cause or reasonable suspicion.

h.  To perform frisks on every stop without regard for reasonable suspicion.

i.  To place vehicle occupants in handcuffs in most situations and cite a fabricated
fear for safety or fleeing as the basis for the same.

j.  To seek searches of vehicles on every stop without regard for reasonable
suspicion or probably cause.

k.  To search vehicles inside and out, as well as belongings inside the vehicle, and
to consider calling in a drug dog without regard for reasonable suspicion or
probable cause.

l.  To rely upon consent from one vehicle occupant as a basis to search the
belongings of all the vehicle's occupants.

62.     These traffic stops routinely violated the constitutional rights of citizens, who were
misled to believe that they were obligated to exit their vehicles, undergo full-body pat-downs and
have officers comb through every crevice of their vehicles, all while the officers had no reasonable
suspicion of criminal activity on the part of the citizen.

63.     The outcome of this initiative was that black drivers in Louisville were at least three
times more likely to be pulled over by LMPD than white drivers.

64.     After this incident, in 2019, Defendant CONRAD further confirmed this initiative,
stating that certain people (including black males) and places (including low income black

neighborhoods) were "targeted" and that black males in low income black neighborhoods were much more likely to be pulled over, searched, and interrogated as a result of these policies.

65.     Thus the Defendants knew or otherwise should have known that this pattern and practice of aggressively and illegally targeting black motorists, subjecting the vehicle occupants to unlawful and humiliating frisks, engaging in unlawful and intrusive searches of the vehicles and performing the conduct with a bullying and biased demeanor is a consistent deprivation of constitutional rights.

66.     Despite this, the custom is for the officers and their superiors to justify these aggressive stops by citing minor traffic violations or leaving the motorist thinking he's committed a minor traffic violation without being cited.

67.     Therefore, LMPD, and as such Defendants CONRAD and METRO, had knowledge that such unconstitutional conduct was being carried out by the Defendant officers indicating that they implicitly authorized, approved, or knowingly acquiesced the unconstitutional conduct of officers, making them officials with final decision-making authority who ratified illegal actions by accepting the existence of a custom of tolerance or acquiescence of federal rights violations.

68.     The decision of Defendants CONRAD and METRO to promote the conduct performed by the LMPD Officers as alleged herein were outrageous, reckless and with blatant disregard for the rights of the public, including the Plaintiffs' rights and were of a nature which shocks the conscience.

69.     Such a failure by Defendants CONRAD and METRO was the moving force behind the violation of MR. BROWN's Constitutional rights as the practices promoted by Defendants

CONRAD and METRO left MR. BROWN and his children, who were driving home without doing any wrong scarred for life and wondering what else he should have done differently.

70.    As such, Defendants CONRAD and METRO are liable under § 1983.  <u>Leach v. Shelby Cty. Sheriff</u>, 891 F.2d 1241 (6th Cir. 1989).  Said conduct makes Defendants liable for MR. BROWN's and the minor children's damages.

**WHEREFORE**, the Plaintiffs, MARLO BROWN and TA'NITA HIPSHER, demand judgment against Defendants CONRAD and METRO, for all damages, including costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and any other relief this Court deems just and proper.

**<u>COUNT III: NEGLIGENCE</u>**
**(Against Defendants ROEDERER and DICKEY)**

71.    Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

72.    Pursuant to existing Kentucky common law including, but not limited to, <u>Destock v. Logsdon</u>, 993 S.W.2d 952 (Ky. 1999) and <u>Grayson Fraternal Order of Eagles v. Claywell</u>, 736 S.W.2d 328 (Ky. 1987), *"the rule is that every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury."*  Further, Defendant ROEDERER and DICKEY's duties of care as a law enforcement officer are specifically and unambiguously defined by Kentucky statute and written LMPD policies, including but not limited to KRS 503.090 and the LMPD SOP manual.

73.    Defendants breached thier duties owed to MR. BROWN under these laws, as described throughout this Complaint, by using an unreasonable exercise of their law enforcement powers to effectuate an unlawful detention and search of MR. BROWN.

74.    Defendants failure to comply with all applicable laws, regulations, rules, orders and policies was the direct and proximate result of MR. BROWN's harm and emotional injuries,

therefore entitling him to recover his compensatory and punitive damages by virtue of KRS 446.070.

**WHEREFORE**, the Plaintiffs, MARLO BROWN and TA'NITA HIPSHER, demand judgment against Defendants, for all damages including costs and reasonable attorneys' fees pursuant to KRS 411.130, and any other relief this Court deems just and proper.

### COUNT IV: INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
**(Against Defendants ROEDERER and DICKEY)**

75.     Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

76.     Defendants owed a duty of care to MR. BROWN.

77.     They breached that duty of care when they unlawfully violated MR. BROWN's Constitutional rights, thus failing to act pursuant to state and constitutional law and exercise due care in protecting MR. BROWN's rights.  See Chestnut v. Commonwealth, 250 S.W.3d 288, 295 (Ky. 2008). (In a claim for emotional distress damages the plaintiff must present evidence of the recognized elements of a common law negligence claim: (1) the defendant owed a duty of care to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury.)

78.     The result of that breach of duty was the incurring of severe and serious emotional injuries to MR. BROWN and his minor children.  See Osborne v. Keeney, 399 S.W.3d 1 (Ky. 2012) ("…to ensure claims are genuine, we agree with our sister jurisdiction, Tennessee, that recovery should be provided only for "severe" or "serious" emotional injury.").

79.     MR. BROWN and his minor children have had to seek therapy since this incident to deal with the trauma they experienced and the apprehensions they now have when interacting

or seeing law enforcement officers. Additionally, MR. BROWN had to endure the humiliation of being detained on the side of a busy road in his neighborhood, as cars passed around him while officers patted him down and searched his vehicle. He also had to listen to the panic and fear of his children, who were worried for their father, and his wife, as she listened to the interaction on the phone. See Id. At 17 (A "serious" or "severe" emotional injury occurs where a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case.  Distress that does not significantly affect the plaintiff's everyday life or require significant treatment will not suffice.).

 **WHEREFORE**, the Plaintiffs, MARLO BROWN and TA'NITA HIPSHER, demand judgment against Defendants, for all damages, including costs and reasonable attorneys' fees pursuant to KRS 411.130, and any other relief this Court deems just and proper.

<u>**PRAYER FOR RELIEF**</u>

 **WHEREFORE**, the Plaintiffs now respectfully demand this Honorable Court grant them the following relief from the Defendants:

 1. Individual judgments against all Defendants in an amount calculated to fairly and reasonably compensate the Plaintiffs for the damages they have sustained;

 2. Nominal, compensatory and punitive damages against each Defendant in an amount to be shown at trial;

 3. Pre-judgement and post-judgement interest;

 4. Their costs and expenses herein expended, including reasonable attorney fees pursuant to 42 USC § 1988 and KRS 411.130;

 5. Trial by jury on any and all issues so triable; and

6.     Any and all other relief to which the Plaintiffs may otherwise be properly and rightfully entitled.

Respectfully submitted,

___/s/ Ashlea N. Hellmann_____
___/s/ Maria A. Fernandez_____
Ashlea N. Hellmann
María A. Fernández
FERNANDEZ HAYNES & MOLONEY PLLC
401 West Main Street, Suite 1807
Louisville, Kentucky 40202
Phone: (502) 589-1001
Fax: (502) 589-7333
ahellmann@fhmlegal.com
mfernandez@fhmlegal.com

## **CERTIFICATE**

This is to certify that a copy of the foregoing motion was sent via certified mail to the following parties, on this the 10th day of December 2019:

| | |
|---|---|
| Louisville-Jefferson County Metro Government<br>527 W. Jefferson Street, 4th floor<br>Louisville, KY 40202 | Chief Steve Conrad<br>Louisville Metro Police Department<br>633 W. Jefferson Street<br>Louisville, KY 40202 |
| Officer Stephen Roederer<br>Louisville Metro Police Department<br>633 W. Jefferson Street<br>Louisville, KY 40202 | Officer Jessica Dickey<br>Louisville Metro Police Department<br>633 W. Jefferson Street<br>Louisville, KY 40202 |

_/s/ Ashlea N. Hellmann_____
Ashlea N. Hellmann